Garry, J.P.
Appeal from a judgment of the County Court of Rensselaer County (Ceresia, J.), rendered April 29, 2013, upon a verdict convicting defendant of the crime of sexual abuse in the first degree.
In August 2012, defendant allegedly broke into the victim’s apartment and forcibly penetrated her vaginally and anally with his fingers and orally with his penis. He was indicted on charges of attempted criminal sexual act in the first degree, sexual abuse in the first degree and burglary in the second degree. Following a jury trial, he was convicted of sexual abuse in the first degree, acquitted of the remaining charges and sentenced to a prison term of seven years, to be followed by 15 years of postrelease supervision. Defendant appeals.
Defendant contends that the verdict is not supported by legally sufficient evidence and is against the weight of the evidence, in that the People failed to prove his identity as the perpetrator of the crime. Specifically, he argues that the victim was unable to identify him as her attacker in a showup identification conducted shortly after the incident, and that she likewise failed to identify him in the courtroom during the trial. Contrary to the People’s argument, defendant properly preserved his legal sufficiency claim by making a motion to dismiss that was “specifically directed” at the issue he now raises upon appeal (People v Abar, 42 AD3d 676, 677 [2007])— that is, the alleged lack of sufficient evidence establishing defendant’s identity.
The People presented the testimony of the victim, the victim’s paramour, the victim’s daughter, an emergency room nurse who treated the victim and several police officers and forensic scientists. Taken together, their testimony established that, on an evening in August 2012, the victim and the paramour spent several hours drinking beer and smoking crack cocaine with defendant at the apartment where the victim and the paramour resided. At approximately 9:00 p.m., the paramour left the apartment to visit a relative. He instructed defendant to leave as well, but defendant allegedly responded that he was too intoxicated to walk to his girlfriend’s nearby apartment and asked to stay at the couple’s apartment until he sobered up. The paramour gave defendant a blanket and pillow and *1250 told him that he could sleep on an outside porch. Defendant and the paramour left the apartment, the paramour locked the door, and the victim lay down on the living room couch to go to sleep.
The victim testified that she heard defendant knocking on the door that connected the porch to the living room, but did not answer the door because she did not want him inside the apartment. She fell asleep and soon thereafter “woke up to [defendant’s] hand on [her] face.” She said that she recognized her attacker as the same person with whom she and the paramour had been smoking and drinking earlier that evening. She testified that, although she struggled with her attacker, he was able to penetrate her vagina and anus with his fingers with enough force to lift her two inches off the couch. She was briefly able to free herself, but he punched her in the head, grabbed the back of her head and pushed her mouth onto his penis. The attack ended after the victim struck defendant in the head with an object. The victim then called her daughter, who testified that the victim was screaming and so upset that she had difficulty breathing. According to the daughter, the victim said that a friend of the paramour had broken into the apartment and had raped her. The daughter went to the apartment, where she noticed that a window leading from the porch to the living room was open and its curtain was out of place. She closed the window and tried to calm the victim down and persuade her to call the police, which the victim was reluctant to do. The victim also insisted on taking a shower despite the daughter’s advice not to do so. A police evidence technician later examined the window that the daughter had closed and testified that the screen was partly open and out of its tracks.
The paramour testified that he telephoned the apartment shortly after the daughter arrived, and she told him that the person he had “left on the back porch just climbed through the window and attacked [the victim].” The paramour called 911, flagged down a police car and directed the officers to a nearby address where defendant had been staying; the officers went there and found defendant. Meanwhile, another police officer was dispatched to the victim’s apartment; he found her in the living room, crying and extremely upset. This officer testified that he transported the victim to the address where defendant had been found and attempted to conduct a showup identification. Although the officer attempted five or six times to focus the victim’s attention on defendant — who was approximately 20 feet from the police car in a well-lit area — the victim would only look at defendant for two seconds or less and failed to *1251 identify him as the attacker. The officer stated that she continued to cry, scream and call for her daughter, and was so upset that “[the officer] couldn’t get her to focus on anything.” Although the victim never affirmatively stated that defendant was not the attacker, she kept repeating that she did not know. The victim testified that she tried to follow the instructions to look at defendant, but that she was scared and crying, her head and eye hurt and her vision was blurry. Notably, the emergency room nurse who examined the victim later that night testified that she found injuries on the victim’s head, face and right eye.
Defendant agreed to go to the police station to speak with police. A video recording of his subsequent interview was introduced into evidence, in which defendant stated that he fell asleep on the porch of the victim’s apartment, awoke after 30 or 45 minutes, knocked on the door and asked for permission to enter and use the restroom. He claimed that the victim allowed him to do so and that he left the apartment immediately thereafter and went to his girlfriend’s residence. Other than shaking the victim’s hand when he left, he denied that he had any physical contact with her. DNA testing was conducted on swabs taken from defendant’s hands and fingers as well as anal, vaginal and oral swabs taken from the victim and a buccal swab taken from the paramour. This testing revealed the presence of a mixed profile containing DNA consistent with that of the victim on the palms of both of defendant’s hands and three fingers on each hand, mixed with the DNA of an additional donor from which the paramour was excluded.
In contending that the People presented insufficient evidence of his identity as the perpetrator, defendant argues that the “touch DNA” on his hands could have been transferred when he shook hands with the victim or touched items in her apartment. However, a forensic scientist testified that it was possible but unlikely that the amount of DNA found to be present could have come from such casual contact, as such DNA would be present in small quantities and would diminish over time. Larger amounts would be transferred and remain present over time, however, if they resulted from intimate contact with wet surfaces such as mucus membranes inside a person’s body or from aggressive contact that involved friction. In this regard, the People argued that if the DNA found on defendant’s hands and fingers had come from his mere presence in the victim’s apartment, then the DNA of the paramour who also lived there should have been present; however, his DNA was specifically excluded from that of the unknown donor whose DNA was mixed with that of the victim on defendant’s hands.
*1252 In addition to the DNA evidence, the victim testified that her attacker was the same person who had been present for several hours earlier in the evening, and the paramour told police and later testified at trial that this person was defendant. The testimony of the victim and the paramour further established that defendant was on the porch just outside the window that was later found to be open shortly after the attack, and defendant placed himself at the scene of the crime by telling police that he was inside the apartment after the paramour had left. Further, the victim testified that her attacker was wearing pants with paint on them, and one of the police officers who interviewed defendant later that night stated that he had what appeared to be paint on his clothing.
Although the victim failed to directly identify defendant as her attacker, we note that “[a]n appellate court does not distinguish between direct or circumstantial evidence” when reviewing legal sufficiency and the weight of the evidence (People v Bush, 266 AD2d 642, 643 [1999] [internal quotation marks and citation omitted], lv denied 94 NY2d 917 [2000]; accord People v Fair, 269 AD2d 91, 93 [2000], lv denied 95 NY2d 963 [2000]; see People v Rossey, 89 NY2d 970, 971 [1997]). Viewing the evidence in the light most favorable to the People, we find a “valid line of reasoning and permissible inferences which could lead a rational person to the conclusion reached by the jury” (People v Bleakley, 69 NY2d 490, 495 [1987]). Specifically, we find that there was legally sufficient evidence of defendant’s identity as the perpetrator of the crime (see People v Dolan, 2 AD3d 745, 746 [2003], lv denied 2 NY3d 798 [2004]; People v Bush, 266 AD2d at 643-644). Further, reviewing the evidence in a neutral light and according deference to the jury’s credibility assessments, we find that the verdict is not against the weight of the evidence (see People v Parker, 127 AD3d 1425, 1426-1427 [2015]; People v McFarland, 106 AD3d 1129, 1131 [2013], lv denied 22 NY3d 1140 [2014]; People v Dolan, 2 AD3d at 746). Defendant’s remaining argument has been examined and found to be without merit.
Lynch, Clark, Mulvey and Aarons, JJ., concur.
Ordered that the judgment is affirmed.