People v Pierre (2018 NY Slip Op 04603)





People v Pierre


2018 NY Slip Op 04603


Decided on June 21, 2018


Appellate Division, Third Department



Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.


This opinion is uncorrected and subject to revision before publication in the Official Reports.



Decided and Entered: June 21, 2018

108762

[*1]THE PEOPLE OF THE STATE OF NEW YORK, Respondent,
v
KEION M. PIERRE, Appellant.

Calendar Date: May 4, 2018

Before: Garry, P.J., Egan Jr., Lynch, Mulvey and Rumsey, JJ.


Rural Law Center of New York, Castleton (Cynthia Feathers of counsel), for appellant.
John M. Muehl, District Attorney, Cooperstown (Michael F. Getman of counsel), for respondent.


Garry, P.J.

MEMORANDUM AND ORDER
Appeal from a judgment of the County Court of Otsego County (Lambert, J.), rendered June 27, 2016, upon a verdict convicting defendant of the crimes of criminal possession of a controlled substance in the third degree (two counts) and criminal possession of a controlled substance in the fifth degree.
Defendant was charged by indictment with criminal possession of a controlled substance in the third degree (two counts) and criminal possession of a controlled substance in the fifth degree. Following a jury trial, he was convicted as charged and sentenced as a second felony offender to an aggregate prison term of 10 years plus three years of postrelease supervision. Defendant appeals.
Defendant asserts that his convictions are against the weight of the evidence, arguing that the verdict was based on speculation and the People failed to prove that he possessed narcotics. At trial, a police officer testified that he was asked to conduct a welfare check at the home of defendant's wife in the City of Oneonta, Otsego County to ensure that defendant — who was the subject of an order of protection in the wife's favor — was not present. When the officer arrived, the wife, who was outside, told the officer that defendant was not there. However, as the officer was leaving, he saw a man behind the house, partially inside the open door of a vehicle. The officer approached and recognized the man as defendant. Planning to make an arrest, the officer told defendant that he was violating the order of protection and directed him to turn [*2]around and place his hands behind his back. After hesitating briefly, defendant fled, running across the yard and alongside the residence to the street. The officer radioed for assistance as he pursued defendant, who turned several corners at intersecting streets. As defendant ran around another corner, the officer — who was then 10 to 15 yards behind — saw him trip, fall to the ground, get up again and then continue to run beyond the corner house, where the officer was unable to see him for a few seconds. When the officer came around the corner, he saw defendant lying on the front lawn of that house, apparently having fallen a second time. The officer tackled him and held him down until assistance arrived. Defendant was taken into custody and was found to be carrying a small quantity of marihuana, about $100 in cash and a pocket-sized digital scale.
A narcotics detective who arrived at the scene a few moments later noticed a clear plastic bag lying in an open area of the lawn, 10 to 15 feet from where defendant had been tackled and taken into custody. Upon closer observation, he saw that the bag held small plastic packages of what appeared to be heroin and crack cocaine. The officer who had pursued defendant determined that the bag was lying in the path that defendant had traveled as he fled, in the same spot where he had fallen for the first time. Later examination and testing revealed that the bag contained four packages of crack cocaine and 24 glassine envelopes of heroin, with a total street value of approximately $1,400. Based upon his training and experience, the detective testified that the presence of two different kinds of drugs, their quantity and value, the manner in which they were packaged and the fact that the packages were closed and had not been partially used indicated that the drugs had been packaged for sale rather than for personal use. He further confirmed that the digital scale that was found in defendant's pocket was of a type that, in his experience, was commonly used to weigh narcotics that were being separated for sale.
The officers stated that the bag did not appear to have been on the lawn for long, as it was clean, with no dirt or grass clippings on top of it, and it was lying on top of the grass rather than pressed into the soil. Further investigation revealed that the house where defendant had fallen belonged to a retired teacher and his wife, who had resided there for more than 20 years. The officers described the house as being well-maintained with a recently mowed lawn, stating that it was "pristine" and "one of the nicest yards on the street," with no debris other than the plastic bag. The officers further stated that they were not aware of any drug activity on the street where this house was located, which they described as a "pretty nice neighborhood" where many families resided. The officer who had pursued defendant acknowledged on cross-examination, however, that he was aware of prior drug activity involving residents of the house where defendant's wife lived, about a block and a half away.
The detective stated that no fingerprint analysis was done on the bag, explaining that fingerprint oil does not adhere well to plastic and it was "almost [100] percent unlikely" that any fingerprints would have been obtained. The officers likewise conducted no DNA analysis. The officer who pursued defendant further acknowledged that he did not see defendant drop anything when he fell. Relying on these alleged flaws, the circumstantial nature of the evidence and the fact that defendant was not carrying the drugs when he was found, defendant argues that there was a reasonable possibility that someone else placed or dropped the drugs on the lawn and that they did not belong to defendant, and that the verdict was therefore based upon speculation.
Had the jury accepted this argument, a different verdict would not have been unreasonable. Thus, this Court must "weigh the relative probative force of conflicting testimony [*3]and the relative strength of conflicting inferences that may be drawn from the testimony" to determine whether the jury gave the evidence the weight that it should have been accorded (People v Scippio, 144 AD3d 1184, 1185 [2016] [internal quotation marks and citations omitted], lv denied 28 NY3d 1150 [2017]; accord People v Cruz, 152 AD3d 822, 823 [2017], lv denied 30 NY3d 1018 [2017]). "We will not distinguish between direct and circumstantial evidence in assessing its weight" (People v Stanfield, 7 AD3d 918, 920 [2004] [citations omitted]; see People v Tunstall, 149 AD3d 1249, 1252 [2017], lv denied 30 NY3d 1023 [2017]). Deferring to the jury's factual determinations and credibility assessments, and viewing the evidence in a neutral light — including defendant's flight, the condition, quantity and value of the drugs, the nature of the location where they were found, their proximity to defendant, and his possession of the digital scale — we do not find that the verdict was against the weight of the evidence (see People v Graham, 138 AD3d 1242, 1243 [2016], lv denied 28 NY3d 930 [2016]; People v Mateo, 13 AD3d 987, 988 [2004], lv denied 5 NY3d 883 [2005]; People v Buchanan, 95 AD3d 1433, 1434-1435 [2012], lvs denied 22 NY3d 1039, 1043 [2013]).
Egan Jr., Lynch, Mulvey and Rumsey, JJ., concur.
ORDERED that the judgment is affirmed.