People v Rosario (2022 NY Slip Op 03351)





People v Rosario


2022 NY Slip Op 03351


Decided on May 24, 2022


Appellate Division, First Department



Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.


This opinion is uncorrected and subject to revision before publication in the Official Reports.



Decided and Entered: May 24, 2022

Before: Manzanet-Daniels, J.P., Mazzarelli, Singh, Scarpulla, Higgitt, JJ. 


Ind. No. 4814/16 Appeal No. 15426 Case No. 2019-1785 

[*1]The People of the State of New York, Respondent,
v
Rafael Rosario, Defendant-Appellant.


Robert S. Dean, Center for Appellate Litigation, New York (Mark W. Zeno of counsel), for appellant.
Alvin L. Bragg, Jr., District Attorney, New York (Diana Wang of counsel), for respondent.



Judgment, Supreme Court, New York County (Gilbert C. Hong, J. at jury trial; Stephen M. Antignani, J. at sentencing), rendered August 30, 2018, convicting defendant of assault in the second degree, leaving the scene of an incident without reporting as a felony and two counts of leaving the scene of an incident without reporting as a misdemeanor, and sentencing him to concurrent terms of 2½ years, 1 to 3 years, 1 year and 1 year, respectively, unanimously affirmed.
At 3:30 a.m. on a Saturday morning, an unmarked police car containing three officers approached the intersection of Wadsworth Avenue in Manhattan while traveling east on 185th Street. The officers were responding to a report of someone with a firearm.
As the police car approached Wadsworth Avenue, the traffic light controlling the intersection turned from red to green, and the officer driving the car proceeded "cautiously" into the intersection because he did not know the area and he was looking for a potentially armed suspect. The car's siren was not on, but at least one of the officers testified that the strobe lights embedded in the headlights were on. The other two officers testified only that the "lights" were on, not clarifying whether the strobes were engaged. While in the intersection, the officers saw headlights coming toward them from their left. The approaching vehicle hit the police car in a "T-bone" fashion and with such force that all three officers lost consciousness and had to be taken to the hospital, with one suffering what a doctor described as a "life-threatening injury" to his brain, and the other two suffering significant and long-lasting pain after the incident.[FN1]
Multiple airbags in the police vehicle deployed, and there was shattered glass strewn about. The roof of the car had to be removed to extract the officer sitting in the back.
When other officers arrived at the scene, they found that the other vehicle, a Porsche SUV, with significant damage to its front end, had been abandoned by its driver. An EZ-Pass device was recovered from the SUV, and was found to be registered in defendant's name and associated with the SUV, which was registered under
the name of Elizabeth Sencion Heredia, with the same address as that of the EZ-Pass
account. Two credit cards, one each in the names of defendant and Elizabeth Heredia, along with two cellphones, and insurance documentation in Heredia's name, were found in the SUV.
An NYPD collision specialist reported to the crash scene at 4:15 a.m. He found no skid marks at the scene, which led him to conclude that the SUV's brakes were not applied before the collision. That finding was further supported by the considerable distance the police car traveled after being struck by the SUV. Nearly two years later, an accident reconstructionist with an expertise in crash data retrieval, crash testing, and airbag deployment, reviewed the NYPD's accident report, diagrams, and photographs of the scene, and the crash data retrieval file. [*2]Based on this review, he testified at trial that the collision was a classic "T-bone" collision in which the Porsche SUV crashed directly into the driver's side of the officers' car. The crash data file from the officers' car indicated that, at 2 seconds before the crash, it was traveling at four miles per hour, and at 1.5 seconds before the crash, it was traveling at nine miles per hour. Based on his calculations, the reconstructionist testified that the Porsche SUV was traveling at the time of impact between 47 and 52 miles per hour, although it could have been traveling as fast as 57 miles per hour. The SUV data did not reveal whether the driver was wearing a seatbelt at the time. When the SUV's airbag was deployed at impact, it hit the driver at a speed of 200 miles per hour, and enveloped the driver "like a pillow," from the top of the driver's head down to the navel.
The NYPD's evidence collection unit used a sterile scalpel to remove the driver's seat airbag, which had deployed out of the steering wheel. It was submitted to the Office of Chief Medical Examiner (OCME) for DNA testing. At trial, Joanna Schlesser-Perry, a supervisory criminalist at OCME and an expert in DNA analysis, DNA profiling, and statistical significance, testified that she reviewed the testing performed on the airbag by an analyst in her group. She explained that a large portion of the SUV's steering wheel airbag was swabbed for DNA analysis, and found to contain a mixture of DNA that most likely came from three people, although it could have contained more contributors. The mixture contained one major contributor and at least two minor contributors. A major contributor is the person who contributes more DNA than any other person on an object. She stated that there tends to be less DNA when it is extracted from skin cells, as was the case here, but that there is a threshold of how much DNA is required to test it and what type of testing can be done. Where there are at least 5 picograms of DNA [FN2], but no more than 20, the lab can test the DNA, but must do so using a process called "high sensitivity testing." Here, she explained, normal testing could be performed, since the sample of DNA extracted from the airbag was 58.71 picograms, over the 20 picogram threshold.
On March 22, 2016, OCME received a buccal swab containing a saliva sample
obtained from defendant. Schlesser-Perry testified that DNA comparison testing revealed that defendant's DNA profile matched that of the major contributor on the airbag, and that only 1 in 6.8 trillion people would have the same DNA profile as the major contributor. Schlesser-Perry further testified about how defendant's DNA could have come to appear on the airbag. She explained that a person can transfer his DNA onto an object by directly touching it, and that the amount of DNA transferred depends on several factors, including the amount of time of contact, the force or "vigorousness" of contact, whether the contact was "moist," and the [*3]surface area of contact. DNA left on an object can "degrade" over time if it is exposed to sunlight or high temperatures.
Schlesser-Perry stated that there are two ways DNA can appear on a surface. "Primary transfer" occurs when an individual comes into contact with an object
directly and leaves skin cells on the object. "Secondary transfer" occurs when an
individual touches a second individual, who then touches an object, and DNA from the
first individual is found on the object. In response to a question on direct examination regarding how likely DNA from a major DNA contributor would have appeared on a surface via secondary transfer, Schlesser-Perry testified that "[i]n my experience it's unlikely that the secondary person is the major contributor to the sample. With each subsequent transfer, whether it's secondary or tertiary . . . with each subsequent transfer less and less and less of the first person's DNA is seen on an item if it's detectable at all."
On cross examination, Schlesser-Perry testified that it could not be determined scientifically whether DNA was deposited on a surface by direct or secondary transfer. She also acknowledged a study on secondary transfer called the "Kale" study. In that experiment, participants wore latex gloves for an hour and a half to promote sweating, and then shook hands for two minutes with a second set of participants, each of whom then touched the handle of a knife. Schlesser-Perry tesitifed that, in a small number of cases, DNA from the first set of individuals was found to be a major contributor on the knife handles. However, she clarified that, "while . . . DNA can get transferred from an individual through handshaking onto an item . . . they were not the major contributor for the majority of the cases though their DNA was detected." Defense counsel and Schlesser-Perry then had the following exchange:
Q: So it's possible that Mr. Rosario's DNA could have been transferred [to the airbag] by secondary transfer?
A: That's possible, but less likely due to, as mentioned in some of the studies, that with each subsequent transfer, the person who didn't touch it, if their DNA is detected, it is less and less. And a study was done in our laboratory that the major contributor was not ever the person that didn't touch it, so it's less likely that the major contributor who contributes the most DNA is from a secondary transfer.
Q: So in your scientific opinion, it is less likely than not that it was a secondary transfer, correct?
A: Yes.
Q: But it is reasonable — it is reasonably possible that the DNA was deposited there through a secondary transfer, right?
A: It's possible.
Defense counsel asked if it was "scientifically possible" that defendant's DNA on the airbag came from the seatbelt, after it came into contact with the airbag upon impact. This question was relevant to defendant's theory that defendant had driven the car on an earlier occasion and transferred DNA onto the seatbelt, which was then [*4]transferred from the seatbelt to the airbag when it deployed as a result of the collision. Schlesser-Perry responded that:
"Some of the DNA that's seen on the air bag may have come from the seat belt. In my opinion it wouldn't be the major contributor because in our laboratory when we did studies to determine how best to get skin cells off of items, like, seat belts, for example, or off of clothing or even off of an air bag we have to vigorously scrabe or swab because skin cells just don't fall off. And as was mentioned earlier, a brief contact is less likely to transfer skin cells. So brief contact with a seat belt would be less likely to transfer skin cells that that contact generated the major contributor to the sample."
Defendant presented Heather Coyle, his own expert in forensic biology, DNA identification, extraction, analysis, quality control, transference, and probabilistic genotyping. She did not conduct any of her own testing, relying instead on OCME's own analyses and testing. Coyle testified that the DNA from the airbag, which was found in approximately 10 skin cells attached to the airbag, contained a mixture of DNA from at least three people. She agreed with the People's expert that defendant was the major contributor of DNA in the mixture. She testified that the amount of DNA left on the airbag was determined by such factors as the length of time that there was contact between the person whose DNA was left and the surface of the airbag, the amount of force at the point of contact, and the degree of "moisture" at the point of contact, from such things as the secretions from the person's face. Coyle stated that the likelihood of DNA transfer would decrease with each transfer event.
Coyle explained that she would have expected that DNA from the driver's face would be transferred to the airbag at the time of its deployment. However, she testified that there was no way to determine scientifically from the DNA when it was deposited on the airbag, and that it could have been transferred from the seat belt. She did acknowledge that she was not certain that any transfer from the seatbelt to the airbag occurred in this case. Coyle was also familiar with the Kale study and the fact that about 20% of the time, the DNA of the person who never touched the knife was found as a major contributor on the knife. She stated that two minutes of handshaking before contact with the knife was "a fairly long period of time," and that because the study designed the conditions to "promote [DNA] transfer to the other person's hand," it presented "an artificial environment" that did not occur "in the real world."
After the close of evidence, defendant requested a circumstantial evidence charge. The prosecutor conceded that the charge was appropriate, but asked the court, to the extent it was going to use the Criminal Jury Instructions, to eliminate the sentence in the standard charge on circumstantial evidence that states "[i]n this case, the People contend [*5]that there is circumstantial evidence of the defendant's guilt." The court agreed to delete the whole sentence and continue with the next sentence of the standard charge, which informs the jury that the court will tell them what constitutes direct and circumstantial evidence and explain how they differ. Defense counsel responded, "Okay." In his summation, the prosecutor argued that even if the evidence could be considered circumstantial, a guilty verdict would be appropriate, but stated as an aside the People's belief that "the airbag is direct evidence" of defendant's guilt. Defense counsel objected to this, but the objection was overruled.
The verdict was based on legally sufficient evidence and was not against the weight of the evidence, with regard to both identity and recklessness. Evidence is legally sufficient if, "after viewing the evidence in the light most favorable to the prosecution . . . any rational trier of fact could have found essential elements of the crime beyond a reasonable doubt" (People v Schulz, 4 NY3d 521, 529 [2005] [internal citation omitted]). In determining whether the verdict is against the weight of the evidence, an appellate court must independently review the evidence and "determine whether an acquittal would not have been unreasonable" (People v Danielson, 9 NY3d 342, 348 [2007]). If so, the court must then weigh the conflicting evidence and inferences and decide whether the jury was justified in finding the defendant guilty beyond a reasonable doubt (id.). Defendant argues that he was convicted without sufficient evidence, and that the verdict was against the weight of the evidence, because the DNA evidence was "underwhelming." He asserts that, unless the only innocent explanation for the presence of a person's DNA at a crime scene is implausible, the People must present something more to secure a conviction. Defendant claims that this was especially the case here since only approximately 10 skin cells were found on the airbag, and that some of those were contributed by two people other than defendant. Moreover, he emphasizes that he had access to the car many times before the incident at issue, meaning that his DNA could have been deposited previously and attached to the airbag via secondary transfer, particularly from the seatbelt.
Defendant relies on People v Graham (107 AD3d 1296 [3d Dept 2013]). In that case, police followed the defendant and a companion, who were acting suspiciously, to the vicinity of a house. When they arrived at the house shortly after the two individuals did, the companion was on the stairs, and the defendant was standing 20 to 30 feet away. They both fled when they saw the police, and upon inspection of the stairs the police found a handgun that contained the defendant's DNA on the trigger and backstrap, as well as that of another individual. While this supplied the jury with sufficient evidence of the defendant's guilt to convict him of criminal possession in the second degree, the [*6]Third Department found that the verdict was against the weight of the evidence. This was because, despite the presence of the defendant's DNA, there was no way to know that he hadn't handled the weapon at some time and place different than those alleged in the indictment. Referencing the testimony of a forensic scientist, the court observed that the defendant may have simply touched his companion, who then handled the gun, transferring some of the defendant's DNA in the process. This was determined to "equally likely to have occurred" in comparison to the prosecution's theory that the defendant handled the handgun immediately before the police found it (Graham, 107 AD3d at 1298).
Defendant further relies on People v Herskovic (165 AD3d 835 [2d Dept 2018]). There, the defendant's conviction for, inter alia, gang assault in the second degree, was reversed as being against the weight of the evidence where the complainant could not identify any of his assailants and the only evidence tying the defendant to the attack was a sneaker that belonged to the complainant and which had been removed from his foot during the incident. When the sneaker was recovered days later, it was found to have DNA on it from at least two contributors. Using a method of analysis employed when there is only a small amount of DNA (less than 100 picograms), the OCME concluded "that it was 695,000 times more probable that the DNA sample originated from the defendant and an unknown unrelated person than from two unknown unrelated persons" (Herskovic, 165 AD3d at 837). The analysis also found that "it was 133 more times more likely that the DNA sample originated from the defendant and the complainant than from the complainant and an unknown unrelated person" (id.). Upon observing that the DNA comparisons were based on the overall Caucasian population, and did not consider that the defendant was from the genetically unique history of the Hasidic population from which he came, and noting that the "likelihood ratio" of 133 was "a relatively insubstantial number," the court found the DNA evidence "less than convincing" (id.). Because the complainant could not identify the defendant, the court held that the evidence did not establish the defendant's guilt beyond a reasonable doubt.
Defendant contends that his case is analogous to Graham and Herskovic because the DNA evidence is similarly unconvincing under the circumstances. We disagree. In Graham, the defendant theoretically had access to the handgun at some point before the time and place alleged in the indictment. As the court found, he could have handled it directly at that prior time and transferred his DNA to it then, or his DNA could have been transferred onto his companion and then onto the gun, like the scenario played out in the Kale study that was described by both of the forensic experts. Here, assuming that defendant had occupied the car at some point before the evening where it collided with the police car, the airbag was [*7]not accessible to him at that time, since car airbags are by definition hidden away until they are deployed, and then discarded. If, as the jury believed, defendant was operating the car at the time of the incident, it is not in dispute that the airbag would have hit him with sufficient force that skin cells from his face or other exposed parts of his body would have been transferred directly to the airbag. Also, there was nothing to suggest that his DNA could have ended up on the airbag through any other process. Defendant speculates that he could have directly transferred DNA to the seatbelt while driving the car on an earlier occasion, and that that DNA could have transferred from the seatbelt to the airbag during the accident. However, Schlesser-Perry testified that this could not have happened through brief contact; rather, skin cells from a surface like a seatbelt would have had to be aggressively swabbed or scraped off. Moreover, even if skin cells had been transferred in this way, she testified that it was unlikely that the person whose DNA was transferred would have been the major contributor to the airbag. Herskovic is similarly distinguishable because the chances of the major contributor being someone other than defendant was 1 in 6.8 trillion, which is obviously much lower than the 1 in 133 likelihood presented in that case. We note, further, that while the presence of the EZ Pass registered in defendant's name and a credit card were not determinative of whether he was driving the car on the evening of the incident, it is significant that there is no evidence or anything in the record to suggest that the vehicle was ever reported stolen.
This case is closer to People v Tunstall (149 AD3d 1249 [3d Dept 2017], lv denied 30 NY3d 1023 [2017]), on which the People rely. In that case, the court affirmed the conviction of the defendant for sexual abuse in the first degree because, although the victim did not identify him at a showup shortly after the incident or in the courtroom, DNA consistent with that of the victim was found on the defendant's palms and fingers, mixed in with that of someone who was not her "paramour." The court rejected the defendant's arguments that the victim's DNA was transferred to him when he admittedly shook her hand the evening of the attack or touched objects in her home, because "a forensic scientist testified that it was possible but unlikely that the amount of DNA found to be present could have come from such casual contact, as such DNA would be present in small quantities and would diminish over time" (Tunstall, 149 AD3d at 1251). Defendant attempts to distinguish Tunstall by focusing on the small amount of DNA found on the airbag. However, Schlesser-Perry testified that the threshold for "normal" DNA testing, which was the majority of the testing her laboratory did, was 20 picograms. Here, 58.71 micrograms of DNA were available for testing, and defendant did not raise a question through his own expert that this [*8]was an insignificant amount of DNA for purposes of analysis, as apparently was the case in Tunstall.
It is notable also that in Tunstall the court credited the forensic scientist's testimony even though that expert acknowledged that it was "possible," albeit "unlikely," that the victim's DNA could have been transferred to the defendant via casual contact. This is consistent with precedent. In Matott v Ward (48 NY2d 455 [1979]), the Court of Appeals stated that the requirement that an expert express her opinion with certainty "is not to be satisfied by a single verbal straitjacket alone, but, rather, by any formulation from which it can be said that the witness' whole opinion reflects an acceptable level of certainty" (48 NY2d at 460 [internal quotation marks omitted]). The Court in that case held that the opinion of a medical expert, while not expressed as being within "a reasonable degree of medical certainty," was properly admitted because, "considering the totality of his testimony rather than focusing narrowly on single answers, [the expert]'s opinion . . . conveyed equivalent assurance that it was not based on either supposition or speculation" (id. at 463). This Court has cited Matott favorably in a criminal case, holding that a verdict was supported by sufficient evidence despite a prosecution expert witness not using the phrase "reasonable degree of scientific certainty," since "it is the meaning and context, not the form, of an expert's opinion that counts" (People v Granger, 26 AD3d 268, 268 [1st Dept 2006], lv denied 6 NY3d 894 [2006]). Thus, to the extent defendant argues that Schlesser-Perry did not state with absolute certainty that the DNA did not come from the seatbelt, this was not an impediment to finding that the verdict was supported by sufficient evidence, since, taken as a whole, her testimony clearly expressed her candid, unembellished, and confident opinion that the DNA on the airbag came directly from the major contributor, and not indirectly from the seatbelt or some other part of the car.
The People were required to prove recklessness as an element of the crime of second degree assault (Penal Law § 120.05[4]). Defendant contends that, even if he was the driver of the car when it hit the police vehicle, there was insufficient evidence that he acted recklessly.[FN3] This is because, he posits, there was no evidence that drugs or alcohol or multiple bad acts were the cause of any dangerous driving. However, defendant provides no support for his theory that criminal recklessness in this context requires the presence of those factors. Indeed, it was sufficient that defendant drove at a speed significantly faster than the speed limit [FN4] and committed the "additional affirmative act" of driving through a red light while another car, with headlights illuminated and possibly strobe lights as well, was passing through the intersection, and never even braking before the collision (People v Asaro, 21 NY3d 677, 684 [2013][internal quotation [*9]marks omitted]). We reject defendant's argument that his conduct cannot be considered reckless because it occurred at a place and time where there was little to no traffic. Driving at double the speed limit through a red light without so much as applying the brakes to check for cars lawfully entering the intersection certainly qualifies as conscious disregard of "a substantial and unjustifiable risk" (id. at 685 [internal quotation marks omitted]). Moreover, while defendant cites cases with more shocking facts to place his own behavior in a more favorable light, there is nothing in those cases to suggest that they describe the minimal level of recklessness necessary to support a conviction for assault in the second degree, and that the type of behavior encountered here can never qualify for that crime as a matter of law.
Finally, defendant's argument regarding the circumstantial evidence charge is unpreserved, and we decline to review it in the interest of justice. THIS CONSTITUTES THE DECISION AND ORDER
OF THE SUPREME COURT, APPELLATE DIVISION, FIRST DEPARTMENT. 
Head align="center">ENTERED: May 24, 2022



Footnotes

Footnote 1: Defendant does not dispute that the injuries constituted "serious physical injury" for purposes of the second degree assault charge.

Footnote 2: A picogram is a trillionth of a gram per microliter.

Footnote 3: Penal Law § 15.05(3) provides that "[a] person acts recklessly with respect to a result or to a circumstance described by a statute defining an offense when he is aware of and consciously disregards a substantial and unjustifiable risk that such result will occur or that such circumstance exists. The risk must be of such nature and degree that disregard thereof constitutes a gross deviation from the standard of conduct that a reasonable person would observe in the situation."

Footnote 4: While the People did not submit evidence of the posted speed limit, we can take judicial notice that at the time of the incident it would have been no more than 25 miles per hour.